UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| EAST COAST SHEET METAL FABRICATING CORP., d/b/a EASTCOAST CAD/CAM,<br><br>      Plaintiff,<br><br>    v.<br><br>AUTODESK, INC.,<br><br>      Defendant. | Civil No. 1:12-cv-517JL |

## AMENDED COMPLAINT

The plaintiff, East Coast Sheet Metal Fabricating Corp. d/b/a EastCoast CAD/CAM ("EastCoast"), alleges in the afore-captioned matter as follows:

### THE PARTIES

1. EastCoast is a corporation of Massachusetts with a principal place of business at 33 Boston Road West, Marlborough, MA 01752.

2. The defendant named in this action is Autodesk, Inc. ("Autodesk"). Upon information and belief, Autodesk is a Delaware corporation having a principal place of business at 111 McInnis Parkway, San Rafael, California 94903 and 100 Commercial Street, Suite 301, Manchester, New Hampshire 03101.

### NATURE OF THE ACTION

3. This is a civil action for patent infringement, breach of fiduciary duty, fraud, unjust enrichment, and breach of contract

1

## JURISDICTION AND VENUE

4. This action arises under the patent laws of the United States (35 U.S.C. § 1, et seq.) and the common law. This court has subject matter jurisdiction pursuant to 28 U.S.C. §§1338 and 1367.

5. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 since Autodesk is located in this Judicial District and has been, and is, engaged in substantial and continuous business activities in this Judicial District.

## THE FACTS

6. The partnership between EastCoast and Autodesk traces its origins back to the January 2004 Air-Conditioning, Heating and Refrigeration Convention where EastCoast was demonstrating its Fabrication CAD (computer aided design) and CAM (computer aided manufacturing) software products. The EastCoast products provided innovative technology for fabricators/contractors of building systems such as plumbing and HVAC (heating, ventilation and air-conditioning).

7. At the show, Joe Massaro ("Massaro") of EastCoast observed Autodesk's Autodesk Building Systems ("ABS") CAD software, which only had design capabilities, but no fabrication capability. Recognizing a potential synergy between the two companies as result of Autodesk's focus on design and EastCoast's focus on fabrication, Massaro approached Autodesk to discuss a potential partnership that would combine the strengths of each company to create a product having a continuous workflow from design to fabrication.

8. In March 2004 a handshake deal was struck between Massaro of EastCoast and Paul McRoberts, Director of Product Development for Autodesk, in which it was agreed that both

companies would work together to create a software product that achieved a true design through fabrication workflow.

9. On November 30, 2004, EastCoast issued a press release announcing the EastCoast and Autodesk alliance. Ex. 5

10. Later that year, EastCoast and Autodesk engaged in a fourteen-city tour to promote their integrated software solution. Ex. 6

11. Later, for reasons unknown, Autodesk announced that it had also formed an alliance with Micro Application Packages Limited ("MAP"), an EastCoast competitor that also had fabrication software.

12. However, the MAP/Autodesk alliance fell apart and MAP announced product offerings that competed with both Autodesk in design and EastCoast in fabrication.

13. Thereafter, Autodesk recommitted to working with EastCoast to meet the challenges posed by MAP. At this time, EastCoast had less than 20 employees and annual revenues of less than $2 million. Autodesk, had around 5,000 employees and net revenues well in excess of $1 billion.

14. On November 14, 2006, Autodesk confirmed in writing what it had already been telling EastCoast in prior discussions -- that it was no longer interested in working with MAP. Autodesk told EastCoast that it would no longer support MAP's CADDuct product. Autodesk also reaffirmed its support for EastCoast and that it looked forward to developing products that directly competed with MAP, especially on MAP's home turf – the United Kingdom. Ex. 7.

15. Based on Autodesk's written and verbal assurances that it was committed to working exclusively with EastCoast, EastCoast entered into a Development Agreement with Autodesk on October 31, 2007, which terminated in eighteen (18) months. Ex. 4.

16. Throughout the term of the Development Agreement, and for several years after termination, EastCoast invested time and resources in marketing and developing products with Autodesk that competed with MAP.

17. The collaboration had them working jointly together in the field to sell the combined software package. Ex. 8.

18. EastCoast engineers also began collaborating with Autodesk engineers by providing Autodesk with proprietary and confidential design information and know-how concerning an EastCoast proprietary connector called a Universal Joint. Ex. 4.

19. In late 2007, the partnership expanded to include developing software for use with additional Autodesk products such as the Revit MEP and the AutoCAD MEP platforms. Ex. 9.

20. This required EastCoast, at considerable financial expense, to build products from the ground up with Autodesk. Throughout the product development, EastCoast and Autodesk viewed the task before them as a team effort.

21. They engineered the products as a team, conducted team meetings on bi-weekly basis, and marketed the products as a team. Ex. 10-12.

22. By the time the Development Agreement had terminated, the joint development effort had begun to take a financial toll on the much smaller EastCoast and, as a result, EastCoast again sought Autodesk's assurance that Autodesk would not abandon the project for EastCoast's competitor, MAP, as had been done before.

23. Autodesk reassured EastCoast both verbally and in writing that it had no intention of working with MAP, that EastCoast was its "premier partner" and that by working together they would "blow" MAP "out of the water" Ex. 13.

24. By the end of 2009, the partnership had solidified to the extent that Autodesk was contemplating taking an equity interest in or acquiring EastCoast. The parties continued their efforts to work together to "blow" MAP "out of the water."

25. The parties thus continued their collaboration efforts in lockstep and continued their bi-weekly collaboration meetings well into 2010.

26. Further examples of the partnership from this period include:

    - Autodesk requesting in April of 2010 that EastCoast submit a marketing plan to plan how to be "successful together" and to "ensure we are in alignment;"

    - Autodesk requesting in July 2010 that EastCoast keep Autodesk updated "on the success and possibly some of the firms who participate in the beta" testing of new products;

    - Autodesk requesting in July 2010 materials regarding EastCoast's beta products to incorporate into its marketing presentations;

    - Autodesk requesting in January 2011 that EastCoast provide information on "the specific workflow requirements your customers require from an MEP Fabrication solution. . . . to help [Autodesk's] internal team understand the needs of MEP fabricators;" and

    - Autodesk requesting in July 2011 that EastCoast provide information "in regards to sales and marketing planning."

27. In March of 2011, Autodesk again acknowledged the value of the expertise EastCoast added to the partnership stating: "ECC's expertise and partnership with AME is extremely high

valued by whole ACA/AME team…The safety of your intellectual properties is the first aim of this change." Ex. 14.

28. Throughout the relationship, Autodesk was continually apprised of the progress being made with adapting the jointly designed software platforms. Ex. 15.

29. Technical collaboration meetings continued into July 2011, when EastCoast met with Autodesk's AutoCAD MEP Product Manager, and the Revit MEP Product Manager.

30. Then, in a meeting on October 12, 2011, Autodesk informed EastCoast that Autodesk was purchasing MAP. With the acquisition of MAP, the joint effort to "blow" MAP "out of the water" came to an end.

## COUNT I – PATENT INFRINGEMENT

31. EastCoast repeats and incorporates by reference the allegations set forth in paragraphs 1 to 30 above.

32. EastCoast is the owner by assignment of U.S. Patent Nos. 7,917,340 ('340 Patent) (Ex. 1); 7,499,839 ('839 Patent) (Ex. 2); and 8,335,667 ('667 Patent) (Ex. 3) (collectively "the EastCoast Patents"). EastCoast has owned the patents throughout the period of defendant's infringing acts and still owns the patents.

33. Autodesk has infringed and continues to infringe the claims of the EastCoast Patents by making, using, offering for sale, and selling in the United States products such as the AutoCAD MEP and Revit MEP product families, including AutoCAD MEP, AutoCAD MEP + Fabrication FABmep, AutoCAD MEP + Fabrication FABmep + Fabrication CADmep, AutoCAD MEP  + Fabrication CADmep, Revit MEP, Revit MEP + Fabrication FABmep, Revit MEP + Fabrication FABmep + Fabrication CADmep (the "Accused Products").

34. The following sets forth an illustrative claim from each patent and the corresponding infringing product.

| Products | '839 Patent illustrative claim | '340 Patent illustrative claim | '667 Patent illustrative claim |
|---|---|---|---|
| AutoCAD MEP |  | 1 | 1 |
| AutoCAD MEP + Fabrication FABmep | 1 | 1 | 1 |
| AutoCAD MEP + Fabrication FABmep + Fabrication CADmep | 1 | 1 | 1 |
| AutoCAD MEP + Fabrication CADmep | 1 | 1 | 1 |
| Revit MEP |  | 1 | 1 |
| Revit MEP + Fabrication FABmep | 1 | 1 | 1 |
| Revit MEP + Fabrication FABmep + Fabrication CADmep | 1 | 1 | 1 |

35. The Accused Products are software products that have computer executable instructions for designing and manufacturing a system having components designed to particular specifications.

36. The Accused Products access a visual representation of components of the system, and obtain geometrical information for the components included in the visual representation.

37. The Accused Products associate property values with the components of the system, and then map the components to standard fittings as a function of standards information, the geometrical information, and associated property values.

38. The Accused Products generate an output that comprises the standard fittings, fabrication information, and a three-dimensional representation of the visual representation, where one or more components of the visual representation have been mapped to standard fittings and include fabrication information in the output.

39. In and around December of 2009, EastCoast informed Autodesk that it was receiving interest from others for licensing opportunities to its patents.

40. Autodesk responded by stating that the EastCoast "patent is strong," and that they had "heard the chatter."

41. Despite its knowledge of EastCoast's patents, coupled with its knowledge that its own products were covered by those patents, Autodesk has continued to produce infringing products in disregard to EastCoast patent rights, and without a reasonable basis to believe it had a right to do so.

42. Therefore, Autodesk's infringement has been willful.

43. Autodesk's infringing acts has caused and will cause continued damage to EastCoast in an amount to be proven in trial.

44. Autodesk's continued acts of infringement will further cause immediate and irreparable harm to EastCoast for which there is no adequate remedy at law, and for which EastCoast is entitled to injunctive relief under 35 U.S.C. § 283.

## COUNT II – BREACH OF FIDUCIARY DUTY

45. EastCoast repeats and incorporates by reference the allegations set forth in paragraphs 1 to 44 above.

46. By virtue of EastCoast's and the Autodesk's relationship which was viewed by both parties as a joint venture or partnership that was created with the goal of developing software to compete with MAP, a fiduciary duty arose between Autodesk and EastCoast. As a result, Autodesk had a duty to act with the highest degree of good faith in its dealings with EastCoast.

47. Autodesk breached its fiduciary duty by engaging in the acts and omissions alleged hereinabove, including secretly engaging in the acquisition of MAP, while, at the same time, leading EastCoast to believe that Autodesk was still honoring its promise to EastCoast that it

"had no intentions of working with MAP" and that it was committed to working with EastCoast to "blow" MAP "out of the water."

48. Had Autodesk informed EastCoast that it was not committed to EastCoast, EastCoast would not have expended the resources it did in working with Autodesk to directly compete with MAP.

49. As a result, Autodesk has caused EastCoast financial damage and has acted with malice entitling EastCoast to punitive and exemplary damages.

## COUNT III – FRAUD

50. EastCoast repeats and incorporates by reference the allegations set forth in paragraphs 1 to 49 above.

51. Autodesk has engaged in the acts and omissions alleged herein, including secretly engaging in the acquisition of MAP, while, at the same time, representing to EastCoast that it had no intentions of working with MAP.

52. For example, on July 9, 2009, Ms. Laura Gutwillig of AutoDesk, represented to EastCoast in an email that Autodesk "totally understand your concerns and rest assured we are fully in support and aligned to keep you as a premier partner. We have no intentions of working with MAP and in fact agree that we can use this to our advantage…We will blow them [MAP] out of the water with our comprehensive plans and just need to ensure that we have what we need to deliver. In fact this is more fuel for my discussion with Jim Lynch regarding additional support for you that are taking place next week." Ex. 13.

53. Such representations from Autodesk continued when on March 22, 2011, Mr. Feng Ding, an employee of Autodesk, represented to EastCoast in an email that "ECC's expertise and

partnership with AME is extremely high valued by whole ACA/AME team…The safety of your intellectual properties is the first aim of this change." Ex. 14.

54. In January of 2011, Ms. Gutwillig of AutoDesk approached EastCoast and asked for a write up of what EastCoast customers require for CAM Fabrication. At no time did Ms. Gutwillig mention Autodesk's plan to acquire MAP and cease its relationship with EastCoast.

55. In July of 2011, Ms. Gutwillig of AutoDesk approached EastCoast and discussed EastCoast's sales and marketing planning for the rest of the 2011 calendar year. At no time did Ms. Gutwillig mention Autodesk's plan to acquire MAP and cease its relationship with EastCoast.

56. In October of 2011, Autodesk informed EastCoast of the "disturbing news" that Autodesk was purchasing MAP.

57. With full knowledge of its representations to EastCoast, Autodesk intentionally pursued the acquisition of MAP while intentionally continuing to engage in a course of conduct with EastCoast that caused EastCoast to believe Autodesk was still committed to working with EastCoast to compete with MAP.

58. On information and belief, and especially in light of Autodesk's previous history with MAP coupled with its impending acquisition of MAP, Autodesk's misrepresentations of the material fact that it had no intention of working with MAP were knowingly made.

59. On information and belief, and especially in light of Autodesk's previous history with MAP coupled with its impending acquisition of MAP, Autodesk's omissions of the material fact that it was in fact in the process of acquiring MAP were knowingly made, and are equivalent to false representations.

60. In reliance upon Autodesk's representations that it was committed to EastCoast, EastCoast continued to conduct its business as a partner with Autodesk.

61. If Autodesk had truthfully informed EastCoast of its intent to acquire MAP, EastCoast would not have continued working with Autodesk to "blow" MAP "out of the water."

62. As a result, Autodesk has financially damaged EastCoast and has acted with malice entitling EastCoast to punitive and exemplary damages.

### COUNT IV – UNJUST ENRICHMENT

63. EastCoast repeats and incorporates by reference the allegations set forth in paragraphs 1 to 62 above.

64. Autodesk was enriched by EastCoast's investment of time and expense in the joint effort to develop Autodesk's market share that was, unbeknownst to EastCoast, used to compete with, and ultimately acquire MAP.

65. For example, even after the Development Agreement terminated, the parties continued their bi-weekly collaboration meetings well into 2010.

66. In April 2010, Autodesk requested that EastCoast submit a marketing plan to plan how to be "successful together" and to "ensure we are in alignment."

67. In July of 2010, Autodesk requested that EastCoast keep Autodesk updated "on the success and possibly some of the firms who participate in the beta" testing of new products.

68. In July 2010, Autodesk requested materials regarding EastCoast's beta products to incorporate into its marketing presentations.

69. In January 2011, Autodesk asked for, and EastCoast provided, information on "the specific workflow requirements your customers require from an MEP Fabrication solution. . . . to help [Autodesk's] internal team understand the needs of MEP fabricators."

70. In July 2011, Autodesk asked for, and EastCoast provided, information "in regards to sales and marketing planning."

71. Technical collaboration meetings continued into July 2011, when EastCoast met with Autodesk's AutoCAD MEP Product Manager, and the Revit MEP Product Manager.

72. During this time period Autodesk corresponded with EastCoast regarding an equity investment into EastCoast to assist it with their collaborative efforts to blow MAP "out of the water."

73. Autodesk backpedaled from the investment, and eventually ceased such discussions.

74. By simultaneously working with EastCoast to create integrated design to fabrication software while also pursuing MAP, Autodesk engineered a win-win situation for itself at EastCoast's expense.

75. With EastCoast's engineering and marketing assistance, Autodesk was able to increase market share to be in a position to compete with MAP.

76. In its secret acquisition talks with MAP, on information and belief, Autodesk used its relationship with EastCoast as leverage to negotiate a more favorable acquisition price for MAP.

77. Moreover, in the event the acquisition fell through, Autodesk was still in a position to compete with MAP by virtue of keeping its premier partner, EastCoast, in the dark about its intent to acquire MAP.

78. Autodesk has been and will continue to be unjustly enriched if permitted to reap the benefits it obtained at EastCoast's expense.

79. As a direct and proximate result of Autodesk's unjust enrichment, EastCoast has suffered and continues to suffer damages.

## COUNT V – BREACH OF CONTRACT

80. EastCoast repeats and incorporates by reference the allegations set forth in paragraphs 1 to 79 above.

81. As set forth in Paragraph 3.2 of the Development Agreement, Autodesk agreed that EastCoast owned all right, title and interest in the Universal Joint defined in EXHIBIT A-2 that was attached thereto. In addition, Autodesk also agreed to transfer any right, title in interest it had in the Universal Joint to EastCoast. Ex. 4.

82. Autodesk has breached the Development Agreement by retaining an interest in the EastCoast Universal Joint as demonstrated by Autodesk currently using the Universal Joint in the Autodesk AutoCAD MEP software.

83. As a direct and proximate result of Autodesk's breach, EastCoast has suffered and continues to suffer damages.

## COUNT VI – BREACH OF CONTRACT

84. EastCoast repeats and incorporates by reference the allegations set forth in paragraphs 1 to 83 above.

85. As set forth in Schedule A of the Development Agreement, support for Revit MEP was to be performed as "deemed appropriate by both parties." Ex. 4.

86. EastCoast provided its CAM software and detailed drawings of its fitting library to Autodesk's Revit MEP team to have them create EastCoast fittings as Revit families that could be used inside of Revit MEP.

87. EastCoast advised Autodesk about its concerns for its intellectual property and how it templates could be distributed.

88. Autodesk breached the Development Agreement by distributing, without any notice, EastCoast's templates in a content pack for Revit MEP 2010.

89. As a direct and proximate result of Autodesk's breach, EastCoast suffered damages.

WHEREFORE, EastCoast demands:

   a) entry of judgment against the defendant;

   b) a final injunction against the defendant;

   c) an accounting for damages for the defendant's infringement;

   d) treble damages for defendant's willful infringement;

   e) attorney fees pursuant to 35 U.S.C. § 285;

   f) actual damages in an amount to be determined for Counts II-VI;

   g) an injunction prohibiting defendant from further exerting control of the Universal Joint, to cease using the Universal Joint in its products, and to transfer any interest it has in the Universal Joint to the plaintiff;

   h) exemplary and punitive damages;

   i) interest and cost; and

   j) all other relief the Court deems just and proper.

March 25, 2013                              Respectfully submitted,

**EAST COAST SHEET METAL FABRICATING CORP., d/b/a EASTCOAST CAD/CAM**

By Its Attorneys,

**RATH, YOUNG AND PIGNATELLI, P.C.**

One Capital Plaza
Concord, NH 03302-1500
(603) 226-2600

By:  /s/ Michael S. Lewis
Michael S. Lewis, Esquire
(NH Bar No. 16466)

Rolf O. Stadheim
Steven R. Pedersen
George C. Summerfield
STADHEIM & GREAR, LTD.
400 North Michigan Avenue, Suite 2200
Chicago, Illinois 60611
(312) 755-4400

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), plaintiff, East Coast Sheet Metal Fabricating Corp. d/b/a EastCoast CAD/CAM, demands a jury trial of all issues properly triable to a jury in this case.

Dated:  March 25, 2013

**RATH, YOUNG AND PIGNATELLI, P.C.**

One Capital Plaza
Concord, NH 03302-1500
(603) 226-2600

By:  /s/ Michael S. Lewis
Michael S. Lewis, Esquire
(NH Bar No. 16466)

**CERTIFICATE OF SERVICE**

I, Michael S. Lewis, hereby certify that the foregoing document and accompanying exhibits were filed with the Court through the ECF system on the 25th day of March 2013, and service will be made electronically by the Court's system to counsel for Autodesk, Inc.:

| | |
|---|---|
| Richard C. Nelson, Esq.<br>NELSON KINDER + MOSSEAU PC<br>99 Middle Street<br>Manchester, NH 03101<br>Tel: (603) 647-1800<br>Email: rnelson@nkmlawyers.com | Donald J. Perreault, Esq.<br>GROSSMAN, TUCKER, PERREAULT<br> & PFLEGER, PLLC<br>55 S. Commercial Street<br>Manchester, NH 03101<br>Tel: (603) 668-6560<br>Email: dperreault@gtpp.com |

                         By: /s/ Michael S. Lewis
                            Michael S. Lewis